## McFADDEN vs BLOCKER.

### Opinion delivered January 13, 1899.

*1.   Chattel Mortgage of Non-resident not entitled to record.*

Under section 4742, Mans. Dig. the filing or recording of a mortgage of chattels in the Indian Territory, by a non-resident thereof was void and of no effect as against creditor of the mortgagor prior to the Act of Congress of February 3, 1897, providing that a chattel mortgage executed by a non-resident might be filed in the District in which the property is located.

*2.   Chattel Mortgage—Common Law Rule.*

At common law, a mortgage of chattels was invalid as to third parties unless there was a delivery and retention of possession of the property mortgaged.

*3. Chattel Mortgage—Recording.*

Congress having passed a law providing that chattel mortgages shall be filed in the district of the mortgagor's residence, and making no provision for recording a mortgage executed by a non-resident mortgagor, the doctrine of "expressio unius est exclusio alteris" applies and the common law in regard to mortgages cannot be invoked.

*4. Chattel Mortgage—Recording Statute—Construction.*

Act of February 3, 1897, validating mortgages executed by non-residents and filed in the district in which personal property was situated, was not a remedial statute, as it gave new rights, that did not exist before, and it was not retroactive so as to divest the lien of an attachment which had been levied on the mortgaged property before the passage of said act.

*5. Statutes Not Construed to Act Retrospectively.*

Statutes not remedial will not be construed to act retrospectively, even when they are not obnoxious to any constitutional objection, unless the intent that they do so is plainly expressed.

*6. Attachment Lien—Vested Right When.*

The lien of an attachment which has been duly levied and perfected by judgement becomes a vested right against the property of the debtor upon which the writ has been levied, which cannot be impaired by subsequent legislation.

*7. Arkansas Statute—Interpretation by Supreme Court of Arkansas.*

The interpretation given the statutes of Arkansas by the Supreme Court of that State, before the extension of those statutes over the Indian Territory, is the statutory law in the Indian Territory.

*8. Actual Knowledge of Unrecorded Mortgage not Notice.*

An unrecorded mortgage gives the mortgagee no right or title against attaching creditors, even though such creditors have actual knowledge of the mortgage.

*9. Attachment—Lien—Practice.*

Under the code of practice in force in the Indian Territory, no special execution is required or provided for in attachment

cases, but the lien of a writ of attachment becomes ipso facto the lien of an execution, from the date of the levy of the attachment, upon perfecting the attachment.

*10.   Attachment—Lien—Vested Rights.*

The attachment herein having been levied and judgment obtained for the debt and sustaining the attachment, before the act of February 3, 1897, validating this and other mortgages, a vested right had accrued, which could not be disturbed, ·even though the statute was intended to be retroactive.

*11.   Interpleader—Attachment—Lien.*

The mortgagee filed an interplea before judgement claiming the mortgaged property. *Held*, This gave the interpleader no priority over the attachment lien.

Appeal from the United States Court for the Northern District.

WILLIAM M. SPRINGER, Judge.

Action by William McFadden & Son against John R. Blocker and others. Evans-Snyder-Buel Company, mortgagee filed an interplea, Judgment for interpleaders. Plaintiffs appeal. Reversed.

The appellants, on the 17th day of June, 1896, brought suit against John R. Blocker et al. in the United States court for the Northern district of the Indian Territory upon a judgment theretofore obtained in the state of Texas. An attachment was also issued at the same time, and levied upon 6,475 head of cattle. On the ——— day of June, 1896, the Evans-Snyder-Buel Company, a corporation organized under the laws of the state of Illinois, under a claim of being owner and entitled to the possession of said cattle, filed the bond and affidavit required by statute, and took possession of them. On the 27th day of January, 1897, it filed its regular interplea, claiming that the cattle attach-

ed were not subject to levy as the property of J. R. Blocker, but that it was the owner of the same by virtue of certain mortgages held by it. On the 29th day of January, 1897, judgment by default was entered against J. R. Blocker in favor of plaintiffs for the sum of $55,875.71, and one also sustaining the attachment. After the rendition of said judgment, to-wit, onthe third day of February, 1897, the congress of the United States enacted and the president approved the following act: "An act relating to mortgages in the Indian Territory. Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that section forty-seven hundred and forty-two of Mansfield's Digest of the Laws of Arkansas, heretofore put in force in the Indian Territory, is hereby amended by adding to said section the following: Provided, that if the mortgagor is a non-resident of the Indian Territory, the mortgage shall be recorded in the judicial district in which the property is situated at the time the mortgage is executed, All mortgages of personal property in the Indian Territory, heretofore executed and recorded in the judicial district thereof in which the property was situated at the time they were executed are hereby validated. Approved February 3, 1897." On April 21, 1897, a trial of the issues arising on the interplea was had. The interpleader introduced in evidence a mortgage executed by John R. Blocker, one of the defendants, to the interpleader, on the cattle levied on by the marshal in the attachment above referred to, to secure a debt of the interpleader of $122,184.62, which mortgage was executed on the 23d day of April, 1896. The mortgage was duly acknowledged, an affidavit attached thereto by the mortgagor, in which he swears that the cattle were located in the pasture where they were found when attached, and that he was a resident of Bexar county, Tex., and that the said cattle were unincumbered. Said mortgage was duly filed for record in Bexar

county, Tex., on the 24th day of April, 1896. It was further filed for record in the office of the clerk of the United States court in the Northern district of the Indian Territory, at Muscogee, on the 27th day of April, 1896. Interpleader also offered in evidence a mortgage made by said Blocker to the interpleader on the 19th day of May, 1896, to secure $9,844.60, which mortgage covered a portion of said cattle. Said mortgage had a like affidavit as that referred to, was duly acknowledged and recorded in the office of the clerk of the United States court at Muskogee, Indian Territory, on the 25th day of May, 1896. Objections were made to the introduction of these mortgages and exceptions duly saved. Interpleader also offered two other mortgages in evidence, but, as they did not include any of the cattle levied upon in the attachment suit, they cut no figure in this case. A comparison of the marshal's return in the attachment suit and the recitals of the first two mortgages shows that all of the cattle levied upon are included in said first two mortgages. They were executed in the state of Texas, and recite the fact that the mortgaged property was at that time, in the Creek Nation, Indian Territory. Interpleader then offered in evidence the writ of attachment in this case and the return thereon, which showed that there had been attached and levied on by the marshal 6,475 cattle. Interpleader then proved by A. Atwater, its secretary, that Blocker had given these mortgages to interpleader to secure the indebtedness mentioned therein, and that interpleader had loaned these sums to the said Blocker, and that at the time the money was loaned the said mortgages were respectively executed, and that no portion of said debt had been paid at the time of the levy of the writ of attachment. Interpleader then offered in evidence the notes made by the said Blocker to it, which were secured by said mortgages; also the drafts drawn by Blocker for said sums of money. Interpleader further proved by the said Blocker that each

and all of the cattle mentioned in the two mortgages were in a pasture about six or seven miles south of Muscogee, in the Creek Nation, Indian Territory, at the time the mortgages were executed, and that the cattle described therein were the identical cattle levied upon by the marshal by virtue of his writ of attachment in this case. Plaintiffs objected to the introduction of the mortgages, because at the time they were recorded in the Indian Territory there was no law authorizing their record, or by which they could become a recorded lien. The objections were overruled, on the ground that the act of congress above set out, and passed three days after plaintiffs' judgment sustaining their attachment, validated such mortgages, and made them a prior lien over the attachment. Plaintiffs, to maintain the issues on their part, put in evidence the record of the judgment for their debt, and the judgment sustaining their attachment, whereupon the interpleader moved the court to direct the jury to return a verdict in its favor, which was accordingly done. The plaintiffs at once filed their motion for a new trial, which was also overruled, whereupon an appeal to this court was prayed and allowed.

*Maxey, Clayton & Martin* and *William T. Hutchings* for appellant.

1. When the mortgages were filed in the Indian Territory, there was no law permitting the filing of a mortgage by a non-resident. To fix any lien on the cattle the laws in force had to be fully complied with. Pyeatt vs Powell, 2 C. C. A. 367; Watson vs Thompson Lumber Co. 49 Ark. 83.

2. The act of February 3, 1897, permitting the filing in the Indian Territory, of a mortgage executed by a non-resident, and validating those already filed, was prospective in its terms and must be so construed. Wade on Retroactive Laws, §§ 34-39, 255, 266. McCracken vs San Francisco,

16 Cal. 591; Black's Constitutional Prohibitions, § 179; 3 A. & E. Enc. Law, (2nd Ed.) 758, note; 7 A. & E. Enc. Law 681, 758; Peck vs Jenness, 7 How. 845; Chew Heong vs U. S. 112 U. S. 536. Dugger vs Ins. Co., 32 S. W. 5; Parsons vs Pain, 26 Ark. 124; Fayette Building Ass. vs Bowles, 39 S. W. 1046; Boylon vs Kelley, 36 N. J. Eq. 331.

3. If such act was intended to be retroactive so as to impair vested rights, it was unconstitutional and void. Wade on Retroactive Laws, §§ 156, 157, 264. Steamship Co. vs Joliffe, 2 Wall, 450; Fletcher vs Peck, 6 Cranch 87; Memphis vs U. S., 7 Otto 293; 7 Lawson's Rights and Remedies, § 3850; Black on Const. Prohibitions, § § 176, 183, 207; Sutherland on Statutory Construction § 480; 3 A. & E. Enc. Law 759-760; The Society vs New Haven, 8 Wheat. 493; Wilkinson vs Leland, 2 Pet. 657; Ferguson vs Williams, 13 N. W. 49; Williamson vs Ry. Co., 29 N. J. Eq. 335.

4. The attachment lien of appellant was perfected by judgment before the passage of the act in question and was a vested right. 1 Shinn. Attach. § 452; Waples on Attach (2nd Ed.) §§ 17; 736; Frellron vs Green, 19 Ark. 376; Bergman vs Sells, 39 Ark. 97; Madden vs. Day, 48 Pac. 1053; Richardson vs Adler, 46 Ark 49; Tyrell vs Rountree, 7 Pet. 464.

*Stuart, Gordon & Hailey* and *H. M. Pollard,* for appellees.

1. The interpleader's mortgage being valid when executed in Texas, because the cattle were then in that state, continued to be valid in any state to which the cattle were afterward taken. Jones on Chattel Mortgages § 301; Cobby on Chattel Mortgages § 475; Hall vs Pillow, 31 Ark. 32; Nat. Bank of Commerce vs Morris, 114 Mo. 255; Hinney vs Baldwin, 16 Ill. 108; Smith vs Whittaker, 23 Ill. 369;

Rountree vs Baker, 52 Ill. 241; Ramsey vs Glenn, 33 Kan. 271; Brown vs Campbell, 44 Kas. 237; Handley vs Hanis, 29 Pac. 1145; Bank vs Massey, 30 Pac. 124.

2. Appellants had actual notice of the mortgage. An unrecorded chattel mortgage is good against attaching creditors who have actual notice. Robinett vs Compton, 2 La. Ann. 846; Norton vs Williams, 9 Iowa 528; Thurman vs Bell, 54 Ark. 273; Meier vs Blume, 80 Mo. 179; Wilson vs Slaughter, 53 Ark. 137; Hoag vs Howard, 55 Cal. 464; Morrow vs Graves, 75 Cal. 218; Holdon vs Garrett, 23 Kas. 98; Northwestern, etc., vs McHaffy, 36 Kan. 152.

CLAYTON, J. The only question presented to us for our consideration in this case is do the mortgages read in evidence give to the interpleader a better title to the mortgaged property at law or equity than that acquired by virtue of the attachment proceedings? At the time the attachment was levied upon the property in controversy, as well as at the time the judgments were rendered in the original suit between the plaintiff and the defendant in the attachment suit, the law governing the recording of mortgages in the Indian Territory was as follows: "All mortgages, whether for real or personal estate, shall be proved or acknowledged in the same manner that deeds for the conveyance of real estate are now required by law to be proved or acknowledged. And when so proved or acknowledged, shall be recorded—if for lands, in the county or counties in which the lands lie; and if for personal property, in the county in which the mortgagor resides," Mansf. Dig. § 4742. This statute was afterward amended by the legislature of Arkansas so as to permit nonresidents to record their mortgages in the county where the property was located at the time of the execution of the mortgage; but this amendment was not passed until after the laws of Arkansas were extended over this jurisdiction, thus leaving the statute, as

above set out, without the amendment, to stand as the law of the Indian Territory in this respect, until the 3d day of February, 1897, at which time congress enacted the amendment to the statute heretofore set out in the statement of the facts of this case.    Up to the date of the act of congress of February 3, 1897, there was no provision of law by which a mortgage executed by a nonresident mortgagor could be recorded in this jurisdiction.    Hence the mortgages in this case, having been executed by a nonresident mortgagor upon property within the limits of this territory, he, the nonresident mortgagor retaining possession thereof, created no lien or title in or to the property as against third persons. "In case the mortgagor resides out of the state, under a statute which provides for the recording of a mortgage at the mortgagor's place of residence, and does not provide for recording it in the place where the mortgaged property is situated, there can be no effectual record of the mortgage and therefore the only effectual mode of making the mortgage is for the mortgagee to take and hold possession of the property."    Jones, Chat. Mortg. § 261; Cobbey, Chat. Mortg. § 578; Smith vs Moore, 11 N. H. 55; Montgomery vs Wright, 8 Mich. 143.    And therefore the recording of these mortgages at Muscogee, in the Indian Territory, was nugatory and without effect.

One of the contentions of the learned counsel for the interpleader, in their brief, is that, inasmuch as there was no statute here providing for the recording of mortgages executed by non-resident mortgagors, the common law would prevail as to them.    There are two answers fatal to this contention:    First.    Congress having enacted a statute relating to the recording of these instruments of writing, and having omitted to provide for the recording of such mortgages, the maxim, "Expressio unius est exclusio alterius," will prevail.    And, second, at common law a mortgage valid against creditors could only be made by a delivery of

the property. It was essential that the custody and possession of the property should be delivered to and retained by the mortgagee. The intent of the statute providing for the recording of mortgages of personal property was to do away with the necessity of any delivery of the property, and to enable mortgagors to hold possession until default. For this purpose registration is required, as giving perhaps, even greater notoriety to the transaction than delivery and retention of possession. Registration thus becomes a substitute as well for delivery as for retaining possession of the property. Jones, Chat. Mortg. § 176. No delivery of the property having been made to the mortgagee in this case, and the possession thereof having been retained by the mortgagor, it is evident that the mortgagee, the interpleader, is in no better condition by considering this mortgage as at common law. Under the statute he is simply the holder of an unrecorded mortgage. At common law he is the holder of a mortgage without delivery or possession of the mortgaged property. The one is the equivalent of the other. As against creditors in either case, they are fraudulent and void.

It is further claimed by the counsel for interpleader in their brief that the cattle at the time of the execution of the mortgage were in Texas, and that the mortgages were there duly recorded prior to the commencement of the attachment suit, and authorities are cited and relied on, to the effect that under such circumstances, when the mortgaged property shall have been thereafter removed into another state, by comity the latter jurisdiction will enforce the lien, although the mortgages may not have been recorded there. But upon a careful examination of the record we find that the cattle which were levied on by the attachment were not in Texas, but in the Indian Territory, at the time of the execution of the mortgages. The return of the marshal to the writ shows that the only cattle attached were

those mentioned in the first two mortgages, and those instruments in terms declare that all the property therein named were in the Creek Nation, Indian Territory, at the time they were executed. And at the trial the interpleader put J. R. Blocker, the mortgagor, on the stand, and he testified that at the time the mortgages were executed all the cattle were in this territory, and this was all the proof there was on this subject. It is true that the cattle embraced in the two latter mortgages were in Texas when the instruments were executed; but none of these were levied on, and, therefore, these two mortgages, with the cattle covered by them, cut no figure in this case. ''The lex citus governs when a mortgage is executed in a state other than that in which the property is situated. Though it be executed according to the requirements of the law of the domicile of the owner in another state, the mortgage will be invalid as against attaching creditors in the state where the property is located, unless the mortgage conforms to the laws of the latter state. The mortgage, to be valid, must be executed, acknowledged and recorded according to the law of the place where the property is at the time.'' Jones, Chat. Mort. § 305; 2 Cobbey, Chat. Mort. § 719, and authorities cited in note 11. The interpleader, therefore, was without a valid record of his mortgage anywhere; and therefore, unless the aforesaid act of congress of February 3, 1897, had the effect of validating them as against an intervening attachment lien, they must be considered and dealt with in this case as simply unrecorded mortgages, with possession in the mortgagor.

Besides the above contentions, the learned counsel for the interpleader submit three propositions. They claim: First, that the aforesaid act of congress is retroactive, and has the effect of postponing the lien of the attachment to that of the unrecorded mortgages; second, if not retroactive, then, because of the fact that the interplea

was filed before the judgment in the attachment suit was rendered, thereby giving actual notice to the plaintiff of the mortgages before the attachment·lien was¡perfected by the judgment, he (the plaintiff) must be considered as a pur-, chaser with actual notice of the existence of the mortgages; and, third, that, inasmuch as the judgment in Texas upon which the original action was brought by the plaintiff in the Indian Territory was rendered prior to the execution of the mortgages, the attachment lien would be without consideration, as having been procured for the purpose of securing the payment of an antecedent debt.    We will consider these propositions in the order named.

First.   Is the act of February 3, 1897, retroactive? The act provides: "That section 4742, of Mansfield's Digest of the Laws of Arkansas, heretofore put in force in the Indian Territory, is hereby amended by adding to said section the following:  'Provided that if the mortgagee is a non-resident of the Indian Territory, the mortgage shall be recorded in the judicial district in which the property is situated at the time the mortgage is executed.   All mortgages of personal property in the Indian Territory, heretofore executed and recorded in the judicial district thereof in which the property was situated at the time they were executed, are hereby validated.' "   It will be seen that this act is purely amendatory.   It does not repeal any act theretofore existing, but undertakes to establish an absolutely new right, to-wit, the right of a non-resident, by virtue of a mortgage, to fix a lien as against third parties upon personal property in the possession of the mortgagor in this territory,—a right which, up to the time of the passage of this act, did not exist, either by statute or the common law. "The legislatures of most of the states have enacted statutes declaring valid acknowledgments and certificates of acknowledgment defective for nonobservances of some statntory requirement, or because taken by an unauthorized

Mortgage by<br>non-resident.<br>Not entitled<br>to record.

officer, and making the record of deeds defectively acknowl-
edged, or not acknowledged at all, notice to subsequent
purchasers and encumbrancers. These acts are generally
retroactive, and have been almost universally held to be
constitutional, on the ground that the acts do not operate
on the deed or contract itself, thus creating a right that did
not previously exist, or altering the terms of an existing
contract, but simply affect the mode of proof, so that the in-
tention of the contracting parties is carried into effect." 1
Am. & Eng. Enc. of Law (2d Ed.) 564, 566, 567, and author-
ities cited. Here, as before stated, a new right is granted
by the act. Under the old law, a mortgage executed by a
nonresident mortgagor could not be recorded at all. A lien
could not be secured by the mortgagee in this way. The
record of the mortgage, however perfect it may have been
in form, proved nothing. There was nothing which could
have been done by him which would make this record evi-
dence of his lien, and the law, as it then stood, intended this
condition. Therefore there were no defects. There was
nothing to cure. These mortgages gave no notice. The
law intended that they should give none. Curative statutes
are not enacted for the purpose of granting new rights, but
only for the purpose of "adding the means of enforcing ex-
isting obligations." Suth. St. Const, § 483.

It will be observed that the act does not undertake to
provide a remedy for the enforcement of a right theretofore
existing, nor a remedy to enforce the right thus created. It
simply granted a new right,—one that, as to nonresidents,
did not exist —and, if retroactive, to make that right apply
to past transactions, which transactions, under the old law,
conferred no rights, and were not lawful to be done, howev-
er well executed, and therefore it was not a remedial act.
Nor does it undertake to cure defects of rights existing
under the old law, or the improper or mistaken execution of
instruments of writing necessary to perfect them. And

therefore it is not a curative act.   Hence the more liberal constructions which courts give to remedial and curative statutes cannot be invoked in this case, and the straightedge of strict construction against the act being retroactive must be applied.

The opinion in the case of· Green vs Abraham, 43 Ark. 420, relied on by counsel for the interpleader, was founded on a strictly curative statute.   In that case the defect was in the acknowledgment to the deed, it having been acknowledged before one of the parties to the instrument, who was a justice of the peace.   The deed was recorded.   The property covered in part by the deed of trust was afterward levied on by Abraham, who was a constable, under a judgment procured by a third party.   Afterwards the legislature of Arkansas passed a curative act, entitled "An act for the better quieting of titles."   Among other things, it provided "that all deeds and other conveyances recorded prior to January 1, 1883, purporting to have been acknowledged before any officer, and which have not heretofore been invalidated by any judicial proceeding, shall be held valid to pass the estate which such conveyance purports to transfer, although such acknowledgment may have been on any account defective;   *   *   *   that the record of all such instruments shall be as valid as if they had been acknowledged and recorded according to law."   After the passage of this act, Green, the judgment debtor, brought replevin for the' corn.   The court held that the act was retroactive, and not unconstitutional, and reversed the judgment of the court below, which had held that the act was unconstitutional as to that case.   From the facts of the case, it will be seen that the new law imposed no new duties nor granted any new rights.   The parties had the lawful right to do that which they defectively did.   The deed was only inoperative because of a defective acknowledgment.   The parties had the

(18)

right to have the deed recorded, and the officer before whom it was acknowledged had the general power to perform the act, but, being a party to the instrument, he could not do so. The error grew out of a mistake as to his powers under the law. In the opinion, the court repeatedly, by express words, designates it as a curative act, and deduces its conclusion by an application of the rule which the books lay down as the test exclusively of such statutes. Suth. St. Const. 483; Cooley, Const. Lim. 371.

It is argued that the act of February 3, 1897, is remedial, and that it simply adds the means of enforcing rights under those mortgages which were existing contracts. If this act was intended to grant relief only to the parties to the instrument, or as to third persons as against a mortgage defectively recorded under a statute which permitted them to be recorded at all, this contention might be sustained, provided it does not impair vested rights. But in this case there is no pretense that the mortgages were defective in form, in the acknowledgment, or in the mode or manner of recording them. Under the policy of the then existing law, they were executed by parties who were not allowed to record them at all. And this was not a mistake of the legislature. This statute has been the law of Arkansas from the time it was admitted as a state of the Union. As evidenced by that act, for more than half a century the policy of that state had been to forbid the record of mortgages executed by non-resident mortgagors. They were a prescribed class, who, at least as against third persons, could only create a lien on personal property by turning over the possession to the mortgagee; and when that statute, by the act of congress of May 2, 1890, was extended over this territory, it came to us granting the same rights, enjoining the same restrictions, enforcing the same policy, and subject to the same construction, as in the state from which it came.

The act of congress of February 3, 1897, evidenced a change of policy of the government. A nonresident mortgagor was taken from the prescribed class, a new right was given to him, and, if the latter clause of the act is to be construed as retroactive, it was not to cure a pre-existing defect, either of law or of fact, because, under the law as it then stood and the facts of this case, no defect existed, but it was intended, after conferring the new right, that the benefits to be derived from it should be extended to cover past acts and transactions, which, at the time they were performed, were against public policy and forbidden by law. Hence, under the facts of this case, the numerous citations of authorities made by counsel in their brief, relating to the law as to curative acts, are not strictly applicable to the points in controversy here; but, as heretofore stated, as to retroactive statutes generally, they are to be strictly construed. "As retrospective laws are generally unjust, and in many cases oppressive, they are not looked upon with favor. Statutes not remedial will, therefore, not be construed to operate retrospectively, even when they are not obnoxious to any constitutional objection, unless the intent that they shall do so is plainly expressed or made to appear." Suth. St. Const. § 463. The settled doctrine of the supreme court of the United States is: "Words in a statute ought not to have a retrospective operation unless they are so clear, strong, and imperative that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied." Chew Heong vs U. S., 112 U. S. 539, 5 Sup. Ct. 255. Wade, in his work on Retrotractive Law (section 34) says; "One of the cardinal rules by which courts are governed in interpreting statutes is that they must be construed as prospective in every instance, except where the legislative intent that they shall act retrospectively is expressed in clear and unambiguous terms, or such intent is necessarily implied from the language of the statute,

which would be inoperative otherwise than retrospectively. This rule rests upon no constitutional limitation of the legislative power, but is a doctrine of the common law, founded upon the recognized injustice of a method of making laws by which the legislature looks backward to discover past errors to be corrected and past grievances to be remedied. In all retroactive laws there must be an element of surprise, by which the persons whose rights are affected are taken unawares. They are called upon to act in a manner different from what they had been led by the previous state of the law to anticipate." Here there is no "element of surprise" by which the parties to the mortgages were "taken unawares." They must be held to have known the law as it then existed. It is not conceivable that business men would invest so large a sum ($120,000) without first acquainting themselves with the law governing so important a matter as the recording of their securities, after having provided by the terms of the instruments themselves that the property should be retained by the mortgagor. The condition of matters in this territory at that time relating to this subject was common knowledge among business men. The law in this particular was well understood by them. They were not led to act in a manner different from what they had been led by the then existing law to anticipate. They simply executed the mortgages, presumably, at least, with the knowledge of the law, recorded them at Muscogee, and took their chances. Having themselves made their beds, is it a hardship that now they shall be required to lie in them?

It is true that curative acts are sometimes passed to relieve against defects caused by the person having been led into doing an act improperly or imperfectly, or by not doing it at all, when necessary to perfect a contract or a right, because of the careless use of words in a statute which are ambiguous and susceptible of a double meaning.

But this would be a defect of the statute, by which the parties, innocently following the unintended meaning of the words, would be taken unawares. But in all such cases the right sought to be perfected must exist. In this case, as to the interpleader, as well as all other persons under the same disabilities—and the act of congress alludes to none other—the right to record the mortgages did not exist, and, if recorded, the plain terms of the law made them a nullity for all purposes of the record. In all cases where a defect of the statute is relied on to sustain a curative act, it must appear that the defect existed in the wording of the very statute, and that by such defect they were led to do, or refrain from doing, some act which worked to their injury; or, in other words, an act which, if properly done, would have inured to their benefit. Otherwise they are not injured; they have suffered no loss; they are not misled or taken unawares. As the recording laws did not relate to them, and they could receive no benefit from them, whether or not those statutes were ambiguous and misleading was no concern of theirs; and they are not in an attitude that they can complain of any defect, if any such existed, in the recording acts. And, under the rule above laid down by Mr. Wade, retroactive laws, enacted for the purpose of curing such defects, cannot be sustained by the courts, not because of any constitutional prohibition, but "because of the recognized injustice of a method of making laws by which the legislature looks backward to discover past errors to be corrected and past grievances to be remedied"; upon which same rule the common law recognizes the doctrine. Wade, Retro. Laws, supra.

Quære, was the act of congress intended to be retroactive? Whether the act, by validating these mortgages, simply intended that from the date of the act they should be valid, so as to relieve the parties from the necessity and expense of further recordation, or that they should be valid

from the date they were recorded, does not certainly appear. There are no express words declaring that they shall be validated from the date of the record. But, for the purposes of this case, let it be conceded that the act of congress was intended to be retroactive. Under all of the circumstances of this case, is not the lien of plaintiffs' attachment a vested right? If so, under the provisions of the fifth amendment to the constitution of the United States, it cannot be impaired by a subsequent act of congress. The lien which a plaintiff acquired by virtue of his attachment proceedings attaches only to the debtor's interest in the property levied upon, whatever that may be, and, if it can be shown that a third person has a lien or an equity superior to the lien of the attachment creditor in or to the property, it will take precedence, and will be protected by the court. And therefore two propositions are presented: (1) Is the lien of an attachment, duly levied and perfected by judgment, a vested right in favor of an attachment creditor as against the attachment debtor? If so, (2) does the equity of a mortgagee holding an unrecorded mortgage, and one which under the law could not have been so executed as to entitle it to record under any circumstances, create any right or title in or to the property as against the lien of the attachment?

As to the creditor: "The lien which the plaintiff acquires by means of a legal attachment is as specific as if created by the voluntary act of the debtor, and stands on as high equitable grounds as a mortgage lien." Shinn, Attachm. 313; Wap. Attachm. 581. A statute passed after the levy, and before the sale, has no effect on the lien. Hall vs Stephens, 65 Mo. 670; Hannahs vs Felt, 15 Iowa, 141. There is a vested right in an accrued cause of action (Suth. St. Const. 48; Smith vs Railroad Co., 62 Miss 510), and to a defense (Suth. St. Const. 48; Davis vs Minor, 1 How. [Miss. 183). A judgment is a vested right. 1 Black]

Judgm. 298; 1 Freem. Judgm. 90. "A lien, or other right, once attached, cannot be destroyed by repeal of the law under which it was derived." Suth. St. Const. 480, and authorities cited in note 3. A judgment lien, however, is not a vested right, It is a lien purely statutory, and is a general, and not a specific, lien upon any specific real estate. Its loss does not necessarily impair the validity of the judgment as a personal security. 1 Black. Judgm. 401. A judgment creditor has neither jus in re nor jus ad rem in the debtor's land, but only the right to make his lien effectual by a sale under execution." 1 Black Judgm. 400; 2 Freem. Judg. 338. It is otherwise with an attachment. It is specific, and, when perfected, the creditor has a jus ad rem. "The jus ad rem, or right in the property to the amount of the debt or lien on property susceptible of being satisfied out of it, is absolutely essential to an action against the property as a thing indebted. Such ordinarily must exist before the action can be instituted, because the very object of the suit is to vindicate the right. The attachment suit is anomalous, for its office is both to create and enforce the lien. The creditor, however, proceeds on the assumption that the jus ad rem already exists. He makes ex parte proof of a state of facts which entitle him to a lien under the law, if his sworn allegations be true. Though entitled to it under such circumstances, the right is not specific until some property or credit of the debtor has been attached. Then the creditor has a jus ad rem. This incipient, specific lien or right is hypothetical. It depends upon being perfected by a judgment retroactive to the time of its inception. If thus matured, it must be deemed a complete incumbrance upon the attached property from the date of its levy, to be marshaled as superior in rank to all subsequent liens, mortgages, assignments, and sales." Wap. Attachm. § 6. In so far as the action of attachment enforces the lien, it is remedial; but in so far as it creates it, it

is the foundation of a right against the debtor which is vested in the plaintiff from the time of the levy, and is as sacred and inviolable as the lien of a mortgage voluntarily put upon the property by the defendant himself." The attaching creditor has a vested right, which the debtor cannot impair. The inchoate lien created by attachment becomes perfected by judgment, which relates back to the seizure, so as to make the lien a perfect one from the beginning." Wap. Attachm. (2d. Ed.) 736. "An attachment is an ancillary remedy provided by statute, by means of which a contingent lien is obtained and impressed upon property of a defendant, which becomes vested and perfected on entry of judgment and levy of execution. Being a remedy provided by statute, and resting on the statute alone, an unconditional repeal of the statute before judgment, and while the lien still remains contingent, destroys the lien." Bank vs Riethman, 25 C. C. A. 101, 79 Fed. 582. But.by this case inferentially, if the repeal be after judgment, the lien would remain unaffected. In the case of Hannahs vs Felt, 15 Iowa, 141, the court directly hold that it is not competent for the legislature to pass a retrospective act which has the effect of rendering an attachment lien, regularly acquired under existing laws before such enactment, nugatory and inoperative. In the case of Hall vs Stephens, 65 Mo. 681, the court say: "Another reason occurs why the statute referred to is inapplicable. The right of the plaintiff accrued by reason of the attachment levied long before the statute under consideration became operative. This did not take place until August 1, 1866, when the general statutes of 1865, where section 14 first appears, took effect. The fact that the judgment and execution occurred at a subsequent period is not material, as it has been frequently decided the execution sale relates to the levy of the attachment and creates, from that moment, a valid charge, which could not be

devested by any subsequently operative legislative enact-ment." In the case of Kelly vs Dill, 23 Minn. 439, the court say: "The proposition that property may be siezed, at-tached, or levied upon, to answer the debts of the owners, includes the further proposition that such seizure, attach-ment, or levy may be made effectual by a sale, or any subsequent acts necessary for that purpose. The liability to seizure implies the liability to sale. The right to sell is fixed by the seizure. Such right is, from the time the lien attaches by the seizure, a vested right and property. In this respect there is no difference between a lien secured by a levy of an attachment and one secured by the docketing of a judgment or the levy of an execution, except that it may be defeated by the dissolution of the attachment or failure to obtain judgment. There is no reason to suppose from the language, either of the constitution or of the statute, that it was intended to give to the debtor the power, by his own acts, to deprive others of rights previously obtained in his property. They could be deprived of such rights only by due process of law." In the case of Day vs Madden (Colo. App.) 48 Pac. 1053, the court say: "This, however, does not dispose of the question. It virtually assumes, as the basis of the proposition, that which remains to be dem-onstrated; and that is whether the plaintiff, by virtue of his writ, acquired that which the legislature was powerless to take away. The courts which have had this question under consideration have always held that, where the law applied only to the remedy, yet if, practically and in effect, it de-stroyed any right which the plaintiff had acquired, or had a right to acquire, it should be taken to affect the substance of his cause of action, and could not be taken to act retro-spectively. The writ of attachment is said to be only a remedy, provided by statute, whereby the plaintiff may secure his debt, if he ultimately be able to prove it and reduce it to judgment. There is a measure of truth in the

contention and I confess that originally I was of the opinion
it was an unanswerable argument that the writ of attach-
ment was only a matter of remedy, and might be destroyed
and taken away by the legislature at will, and the plaintiff
was not at liberty to complain. Maturer reflection, how-
ever, has convinced me that the right to a writ of attach-
ment, when it accrued and was exercised while the statute
was in force permitting it, gave to the attachment plaintiff a
right which may be called either 'vested' or 'substantial,' at
pleasure, but nevertheless a right which could be neither
taken away nor destroyed by the repeal of the statute under
which it had been regularly acquired. This contention has
been forced upon me as a result of an examination of the
various authorities in this state regarding attachments liens
and the rights of attachment creditors, as well as by a con-
sideration of the force and effect of the act of 1891, which
has been adverted to. Under our statutes, an attachment
plaintiff is in reality and for many purposes an incumbran-
cer. It is quite true the lien which he acquired is contin-
gent rather than inchoate, and dependent, not only upon a
compliance with the statute which provides for its issue,
but also upon the subsequent recovery of a judgment and
proof of a cause of action on which he had a right to sue
when he commenced his action. In this sense it is contin-
gent; in another, it is absolute, or becomes absolute, if the
ground of it be not successfully traversed and the plaintiff
ultimately succeeds. If the plaintiff recover judgment, and
his attachment be sustained, he acquires an absolute lien,
which has existed from the time of the levy of the process,
relates back to that date, and is enforceable as of that time
and to that extent, as against all intervening persons,
whether purchasers, incumbrancers, or execution or attach-
ing creditors. In other words, he has an absolute right to
have subjected to his execution the property which he has
impounded, and its proceeds may be devoted to the liquida-

tion of the debt, as against all other persons who are subsequent in time in their rights, and however their rights may be acquired. It has even been held in this state that the giving of a forthcoming bond does not release the attachment, but that the property still remains subject to the writ and the lien until the judgment is paid and satisfied. The lien has been adjudged good as against unrecorded deeds as well as subsequent attaching creditors. We are therefore of the opinion that the judgment should have sustained the attachment, because by the levy the plaintiff acquired an interest in the property which became definite, fixed, certain, and vested by the ultimate recovery.''

And when, as in this case, the judgments, both in the attachment and the personal suit, shall have been rendered by the court prior to the enactment of the statute claimed to be retroactive, the reason for protecting the lien established by the proceeding becomes the stronger. When these judgments are rendered, the attachment suit becomes merged into the personal judgment; it is at an end; it no longer exists. As a remedy in the particular case, it has fully performed its offices and established the rights for which it was called into requisition. The remedy is at an end, but that which was established by its use—the lien—stands as the final judgment of a court of competent jurisdiction, rendered at the conclusion of the suit, and hence any subsequent legislative enactment relating to it cannot be said to relate to the remedy, for that had been exhausteḍ. From the very nature of things, it can only relate to the right; and that right is the lien unalterably fixed by law and the judgment of a court—a right to have appropriated to the payment of a judgment debt specific property, which has been duly brought into the custody of the law and condemned to that purpose. Hannahs vs Felt, 15 Iowa, 141; Tillotson vs Millard, 7 Minn. 513 (Gil. 419); Goore vs McDaniel, 1 McCord, 480; People vs Cameron, 7 Ill. 468; Lyon vs Sandford, 5

Conn. 547; Myers, Vested Rights, 138 et seq.; Richardson vs
Adler, 46 Ark. 43; Lackey vs Seibert, 23 Mo. 85.     Chief
Justice Marshall, in the case of Tyrell vs Rountree, 7 Pet.
464, says: ''An interest was vested in him for the purpose
of that judgment.   The judgment did not create a general
lien on it, but was a specific appropriation of the property
itself to the satisfaction of that particular judgment.   The
process which issued did not direct the officer to levy it on
the property of the defendants, but to sell that specific
property which was already in his possession by virtue of
the attachment and was already condemned by the judge of
a competent tribunal. The subsequent division of the county
could not devest this vested interest, or deprive the officer
of the power to finish a process which was rightly begun.''
Lien of at-     We hold therefore, that the lien of an attachment which has
tachment.
When a     been duly levied and perfected by a judgment becomes a
vested right.
vested right as against the property of the debtor upon
which the writ has been levied, which cannot be impaired by
subsequent legislation.

But, this lien being only valid as against whatever
title the defendant has to the property, is it valid in favor of
an attaching creditor as against the title of a mortgagee
holding an unrecorded mortgage upon it?   It is common
knowledge that, as between the parties to a mortgage, the
legal title is vested in the mortgagee, whether the mortgage
be recorded or not, although the possession remains in the
mortgagor.   As to them the only interest or title remaining
in the mortgagor is an equity of redemption.   He has the
title only to that which is left after the payment of the
mortgage debt; and, if the mortgage be recorded, this is also
true as to all subsequent incumbrancers and purchasers for
value, and, therefore, this is all the lien can attach to.   But
if the mortgage be unrecorded, and possession retained by
the mortgagor; as to them he is considered as the owner of
both the legal and equitable title, the effect of which is to

postpone all of the rights of the mortgagee under the mortgage to those of such subsequent incumbrancers and purchasers for value. And the lien of a subseqent attachment is such an incumbrance, otherwise it could not take priority over the unrecorded mortgage. Mr. Shinn, in his work on Attachment and Garnishment (section 418), says: "The recording of chattel mortgages being required by law as notice to the third persons of the mortgagee's claim when he is not in actual possession of the pledged property, a subsequent attaching creditor will have priority over a creditor secured by chattel mortgages when the same have not been placed of record." Waples, in his work on Attachment and Garnishment (section 495), lays down the same doctrine as follows: "The attaching creditor, however, would gain rank above the mortgagee should he attach without notice, and in good faith, prior to the recording of the mortgage; and so, also, if the mortgage is recorded, but with an inadequate description of the debt to be secured—not sufficient as notice." See, also, authorities cited in note 2; Fearey vs Cummings, 41 Mich. 376, 1 N. W. 946; Hardaway vs Semmes, 38 Ala. 657; Beamer vs Freeman, 84 Cal. 554, 24 Pac. 169. The lien of an attaching creditor is deemed to create an equitable title equal to that of a purchaser. 1 Shinn, Attchm. § 417. Inasmuch as the lien of an attachment is only an incumbrance on whatever interest or title the debtor has in the property levied on, and as the lien becomes an incumbrance on all of his property as as against a mortgagee with an unrecorded mortgage upon it, it necessarily follows that, in law, the debtor is the owner of it all, and, as between the attaching creditor and the mortgagee, the mortgagee is without interest or title, either legal or equitable. The supreme court of Arkansas, passing on the very statute now in force in the Indian Territory, has uniformly held to this doctrine. Section 4743 of Mansfield's Digest is as follows: "Every mortgage, whether for real or personal property,

shall be a lien on the mortgaged property from the time the same is filed in the recorder's office for record, and not before which filing shall be notice to all persons of the existence of such mortgage." In the case of Main vs Alexander, 9 Ark. 112, decided in 1848, the court gave a construction to the statute, which has ever since been followed in that state. A mortgage had been executed upon a slave, to secure the payment of borrowed money, and was recorded, but had not been acknowledged according to law. Two attachments were afterwards sued out by attaching creditors, and the writs levied on the slave. At the time of the commencement of the suits they had actual knowledge of the existence of the mortgage. While these suits were pending, the mortgagee brought an action to foreclose the mortgage, making the attaching creditors parties to the suit. Upon this state of facts, the court, after holding that, as between the parties to the instrument, the mortgage was valid, say: "The appellants insist that, as their attachments were levied upon the mortgaged property before the mortgage was acknowledged and recorded, as required by the act, their rights thus acquired take precedence of and override those of the mortgagee. This brings us to the main point in the case, and upon its decision the whole of it must turn. The question is whether the levy of the attachment merely changes the custody of the property from the hands of the mortgagor, and places it into the keeping of the law, for the purpose of confining it within the jurisdiction of the court, and to abide the event of the attachment suit, though subject to the paramount rights of the mortgagee, or whether the act of levying the attachment before foreclosure and sale did not, ipso facto, utterly oust the mortgagee of all rights that he had acquired under the mortgage. We think it clear that the latter proposition is true. The attachments found the right of the mortgagee in an inchoate and imperfect state, subject to be devested either by a subsequent purchaser or

a judgment creditor, and transferred it into the custody of the law, with all its imperfections upon it, to await the final judgment of the law.  The instant it passed into the custody of the law, it went out of the reach of all persons having mere inchoate rights; and those rights, if not utterly destroyed, must at least remain in abeyance until the property shall be legally released from the grasp of the attachment. The law regards a mortgage which has not been acknowledged and filed for record as a fraud upon the rights of strangers, and consequently it will not countenance and uphold it in opposition to such rights.'' In Dodd vs Parker, 40 Ark. 540, the court say:  ''Our statute of mortgages is peculiar.  It provides that every mortgage shall be a lien on the mortgaged property from the time it is filed for record, and not before; which filing shall be notice to all persons of the existence of the mortgage.  And it cannot be legally filed for record until it has been properly acknowledged. Hence it has been uniformly held in this state that an unregistered mortgage, or one which has been improperly admitted to registration, constitutes no lien upon the mortgaged property as against a stranger, notwithstanding he may have actual knowledge of its existence." In the case of Cross vs Fombey, 54 Ark. 179, 15 S. W. 461, a mortgage was executed conveying to the mortgagee in trust certain corn and cotton, but the deed was not then recorded. An attachment suit was afterwards brought by a creditor, and the writ levied on the mortgaged property. The day after the levy the deed was recorded.  The mortgagee brought an action of replevin for the possession of the property.  The court, in holding that the attachment lien was precedent to that of the mortgage, said:  ''We have no hesitation in saying that, under the statute of this state, an order of attachment becomes a lien upon the property of the defendants, subject to seizure on execution for the debts of the defendant in the county from the time the order comes to the hands

of the officer; and that, by levy of the attachment and judgment sustaining the same, such inchoate lien is perfected, and takes precedence of the lien of a mortgage executed before the order of attachment came to the hands of the officer, but not recorded till afterwards.'' See, also, Hannah vs Carrington, 18 Ark. 105; Jacoway vs Gault, 20 Ark. 190; Carnall vs Duval, 22 Ark. 136; Little vs Dodge, 32 Ark. 453; Martin vs O'Bannon, 35 Ark. 67; Conner vs Abbott, Id. 365.

<span class="margin-note">Decision of Supreme Court of Arkansas. When conclu sive.</span>
Whatever the law may be elsewhere, these Arkansas statutes having been extended over this territory by an act of congress after these adjudications had been rendered, the interpretation given to them by the supreme court of Arkansas is the statutory law of this jurisdiction. Sanger vs Flow, 1 C. C. A. 56, 48 Fed. 152; Hogg vs Emerson 6 How. 483; Stutsman Co. vs Wallace, 142 U. S. 295, 12 Sup. Ct. 227. Hence it appears that in this jurisdiction an unrecorded mortgage gives the mortgagee no right or title to the mort-

<span class="margin-note">No rights acquired under unrecorded chattel mortgage.</span>
gaged property as against attaching creditors, and therefore, although the attachment lien is only effective as against whatever interest the debtor may have in the property, the debtor being the mortgagor in possession, and the mortgage being unrecorded, the law as to the attaching creditors regards him as the absolute owner, and subjects the whole estate to the lien of the attachment.

Again, under our Code of Practice in attachment cases, a special execution is no longer necessary. No execution upon the personal judgment against the general effects of the defendant is issued in this jurisdiction. Before the Civil Code of Practice was adopted in Arkansas, in 1868, a special execution issued against the property siezed, but since the Code the practice has been for the court to order the sale, and apply the proceeds to the debt as ascertained by the personal judgment. Feild vs Dortch, 34 Ark. 407. Hence an attachment here serves not only its own office, but also that of an execution; and, when the personal

judgment has been rendered, as in this case, its lien becomes, ipso facto, the lien of an execution levied on the attached property, or, at least, a lien of as high order, and, whatever may be the rule as to the relative standing of the two liens in other jurisdictions, it is obviously certain that here the lien of an attachment perfected by judgment becomes a vested right, if the lien of an execution levied upon the property be such. It only remains, then, to be shown that an execution lien, when levied, becomes a vested right. Wade, Retro. Laws, § 167, says: "When the binding force of an instrument affecting the title to the property depends upon its being properly filed for record, we shall see hereafter that there are many omissions in this respect which may be cured by retrospective enactment; and, even where the effect of the statute is to validate instruments otherwise void, it has been sustained upon the ground that it operated to give legal effect to moral obligations. The correction of such mistakes and omissions has been authorized by a state constitution; but, when the rights of third parties intervene, the statute will not operate to divest their rights. Thus, where a chattel mortgage was improperly recorded, and an execution was levied on the property therein described, it was held that the latter would continue to hold the precedence obtained by the levy, notwithstanding a subsequent statute validating the defective record by declaring lawful the manner in which the instrument was recorded." In the next section he says: "The right of a judgment creditor to have satisfaction becomes vested by the levy of his execution. This right is treated as property, because it is of the same essential nature as other property; and a statute which undertakes to supersede the right by validating a lien which could not have been interposed when the levy was made is obnoxious to the objection that it is a law depriving one of his property otherwise than by due process of law, or the law of the land." In Williamson vs Railroad Co., 29

(19)

N. J. Eq. 311, the court held that the lien of an execution levied on the property of the debtor was a vested right, and declared an act of the legislature of New Jersey to be unconstitutional which had enacted that unrecorded chattel mortgages executed prior to the levy thould be validated; and they rested their decision solely on the ground that an executed lien was a vested right.  See, also, Herm. Ex'ns, 172; 2 Freem. Ex'ns 268.  In the case of Gunn vs Barry, 15 Wall. 610, the supreme court of the United States held that the lien of a judgment was a vested right.  In Mc-Keithan vs Terry, 64 N. C. 25, the court say that by that levy of an execution the plaintiff acquired a "specific lien," a "vested right."  Under both of these propositions we therefore hold that the attachment lien in this case, having been perfected by judgment prior to the act of congress of February 3, 1897, became a vested right, and therefore the act, whether intended to be retroactive or not, was ineffectual to devest the lien.

The second contention is, as heretofore stated, that, considering the act of congress as prospective, then, although there was no notice to the attaching creditor, actual or constructive, of the existence of the mortgage at the time the suit was brought and the writ levied, yet, because of the fact that pending the action, and before judgment, the interplea was filed, setting up the mortgages, this would be notice to the plaintiff, putting him in the attitude of a subsequent incumbrancer with actual notice.  Whatever may be the law of other jurisdictions on this point, we think it clear that the law here is against this contention.  The statutes having been so often construed by the supreme court of Arkansas prior to the time that they were extended over this territory to be that "an unregistered mortgage, or one that has been improperly admitted to registration, constitutes no lien upon the mortgaged property as against a stranger, notwithstanding he may have had actual know-

ledge of its existence," seems to us to be conclusive of this contention. In Jacoway vs Gault, 20 Ark. 193, the court say: "A mortgage not acknowledged or proven and recorded, as required by the statute, though good as between the parties to it, is not valid as against subsequent purchasers or encumbrancers of the mortgaged premises, though they have actual notice of the existence of the mortgage." In Cross vs Fombey, 54 Ark. 184, 15 S. W. 463, where the mortgage was filed the day after the writ of attachment was levied, the court say: "Though good between the parties, until filed for record under the statute the lien of the mortgage as to third parties has no existence, and is not binding upon them, though they have actual notice of it;" and the court held that the attachment lien took precedence of the mortgage. And so it is decided in Dodd vs Parker, 40 Ark. 540; Haskill vs Sevier, 25 Ark. 158; Watson vs Lumber Co., 49 Ark. 85, 4 S. W. 62; Main vs Alexander, 9 Ark. 112; and other cases heretofore cited. All that is claimed in this case on this point is that the filing of the interplea before judgment gave actual notice of the existence of the unrecorded mortgages. Conceding that it did, if actual notice is not sufficient at all, how can it avail the interpleader here that he gave actual notice pending the action of the attachment proceedings? And if actual notice were sufficient, inasmuch as the judgment in these proceedings relates back to the levy of the writ on the property, creating a perfect lien from that time, the notice given by the interplea would come too late. In Cross vs Fombey, supra, actual possession of the mortgaged property was taken by the mortgagee after the writ of attachment came into the hands of the officer, but before levy. The court held that, as the lien related back to the time the writ came into the hands of the officer, it took precedence of the mortgage. Frellson vs Green, 19 Ark. 376; Bergman vs Sells, 39 Ark. 97. "The priority incident to the notice of a chattel mortgage at the

time the attachment was levied will not be affected by a subsequent notice or record of such mortgage prior to execution and sale on the judgment obtained in attachment." 1 Shinn, Attachm. § 418. Therefore, on both of the above propositions we hold that the notice given by the interplea did not have the effect of giving to the mortgage a priority over the attachment lien.

And this brings us to a consideration of the third and last contention of the interpleader, to-wit: Inasmuch as the suit of the plaintiff in the Indian Territory was brought on a judgment in Texas, which had been rendered prior to the execution of the mortgage of the interpleader, that the lien of the attachment was without consideration, because established to secure the payment of an antecedent debt, and that, therefore, the equities of the interpleader, although his mortgages were unrecorded, would be superior to those given to the plaintiff by virtue of his attachment lien. The fact that the judgment in Texas, upon which the plaintiff's suit was brought in this territory, was rendered before the execution of the mortgage, is not important in this case, further than to show that the debt upon which the suit was brought was past due, and therefore antecedent to the action, unless such a creditor is excluded by the recording acts. But, inasmuch as the law requires the debt to be due in every case before a suit can be brought to secure it, the consideration of all judgments may be said to be antecedent debts. And the same is true of attachment proceedings, except in the few exceptional cases where the law permits suits of this character to be instituted before the debt is due, and therefore the consideration of attachment liens are also pre-existing debts. But the fact that these debts were past due renders persons to whom they may be owing none the less creditors; and if, after these debts shall have been reduced to judgments, and specific liens by the levy of an attachment shall have been imposed upon the property,

whether such creditors are to be treated as purchasers who have acquired the property without advancing new considerations, so as to postpone the attachment to the equities of a mortgage holding against the property of an unrecorded mortgagee, must be determined by a construction of the statute. We are cited by the learned counsel for the interpleader to the following extract from 20 Am. & Eng. Enc. Law, 517: "Creditors: The term 'purchaser' undoubtedly presupposes the acquisition of some direct interest in the subject of at least such force as is obtained by way of a lien, and therefore does not comprehend mere general creditors. And, since a creditor who has obtained a lien on the property of the debtor by attachment, judgment, or levy of execution is regarded as acquiring only the rights which the debtor had,—i. e., that whatever rights he obtains are got under, and not through, his debtor,—and advances no new consideration, such creditor will not thereby be brought within the meaning of the term, and the failure to record will not invalidate an instrument as to a subsequent attachment, judgment, or execution creditor." But by an examination of cases in the note to said extract it will be seen that the statutes of the states so holding all provide that the want of notice and the imputed fraudulent character of an unrecorded mortgage apply only to subsequent purchasers, and not creditors. Immediately following the above extract, upon the next page of the same book, treating of "Persons protected by the recording acts," we have the following: "But by the terms of the statutes in some states this protection is extended to creditors. Yet, unless otherwise compelled by the express provisions of these statutes, the protection given against unrecorded conveyances will be limited to such creditors as have effected a lien on the conveying debtor's property by attachment, judgment, or otherwise, before the recordation of the prior conveyance. It cannot be maintained that the lien of a judgment will

attach to only those interests which a debtor still actually has, for it will attach to all interests which appear from the records to be in the judgment debtor." And among the many states referred to by the notes to this extract as being governed by statutes of this kind, Arkansas is mentioned. The Texas statute provides that unrecorded conveyances shall be void as to "all creditors and subsequent purchasers for valuable consideration and without notice." In the case of Grace vs Wade, 45 Tex. 522, overruling the case of Price vs Cole, 35 Tex. 461, the court say: "The only question in this case is whether a vendee of land, who claims title by an unrecorded deed, or bond for title, or the purchaser, with notice of such deed or bond, at execution sale on a judgment against the vendor, where the creditor has no notice of the title or claim of the vendee at the date of the levy of the execution, has the better title. The determination of this question depends upon the mature character of the lien acquired by a creditor by the judgment and levy of execution, and, if it is admitted that the lien of a creditor is superior to the unrecorded deed of the vendee, whether a purchaser under the execution with notice is entitled to all the rights of the creditor." After deciding that the purchaser at the execution sale with notice of the unrecorded encumbrance was entitled to all of the rights acquired by the judgment creditor by virtue of his judgment and levy of the execution, the court say: "It is well settled that the lien acquired by a judgment or levy of an execution by the common law extends to and binds only such title or interest as the debtor has in the land at the date of the judgment or levy of the execution under which the lien is claimed, and that the equitable rights of third persons will be upheld against the legal lien of the debtor. But the rights of the lien creditor and of third parties claiming by unrecorded conveyances are not to be determined with us by the common law, but by the statute changing and modifying, and to

some extent, at least, entirely abrogating, the common-law rule in such case," The court then decide that the statute make unrecorded conveyances void as to all creditors, both prior and subsequent to the execution of the instrument; but, as to purchasers, void only as to subsequent purchasers for a valuable consideration, and without notice. This decision has been followed and approved in the cases of Grimes vs Hobson, 46 Tex.. 416, Catlin v. Bennatt, 47 Tex. 165; and Mainwarring vs Templeman, 51 Tex. 205. In the case of Stevenson vs Railway Co., 105 U. S. 703, the supreme court of the United States adopt and follow this construction of the Texas statute.

In New York, under a similar statute, the same doctrine is held. In the case of Thompson vs Van Vechten, 27 N. Y. 568, the court say: "The statute also declares that every mortgage filed pursuant to its provisions shall cease to be valid against the creditors of the mortgagor, or against subsequent purchasers and mortgagees, after one year from such filing, unless within thirty days preceding the expiration of the year it shall be again filed, with a statement of the interest of the mortgagee. The question is whether a creditor must, in order to avail himself of this provision, have become such during the default in refiling. We have given a construction of this provision in its bearing upon purchasers and mortgagees in Meech vs Patchin, 14 N. Y. 71, and we held that a mortgagee could not take advantage of an omission to refile unless he became such mortgagee during the existence of the default. This was based very much on the word 'subsequent,' which is used to qualify the term 'purchasers and mortgagees,' and means, as we thought, 'subsequent to the omission to refile.' But this expression is not employed as regards creditors. Reading the statute literally, the creditors who may take advantage of the default in refiling embrace all the creditors of the mortgagor, without regard to the time when the debts were con-

tracted.   It may be said that if the creditor, having the statutory notice that the goods of the party with whom he is about to deal are mortgaged, trusts him notwithstanding, he is not likely to be prejudiced by the want of record information that the lien is still existing after the expiration of the year; and this is true.   He certainly has not the same need of this information which he had of the existence of the mortgage when he first dealt with the mortgagor.   Still he may give further time of payment, or omit to enforce his demand, if he finds that the lien of the mortgage is not kept up, when he would have acted differently upon learning that it was continued.   The language of the statute being direct and positive, I do not think we ought to hold that the lien continued, as against these executions, after the default in refiling the mortgage."   See, also, Jones vs Graham, 77 N. Y. 628.   And this is the construction given by all of the states with similar statutes, many of them holding, however, that the lien must attach before the creditor has notice of the existence of the deed.   Gill vs Pinney, 12 Ohio St. 38; Jones vs Graham, supra; Overstreet vs Manning, 67 Tex. 657, 4 S. W. 248.   The states having statutes extending the protection of the recording acts to creditors are: Ohio, Alabama, Illinois, Mississippi, Nebraska, New York, Tennessee, Texas, North Carolina, South Carolina, Delaware, Florida, Kentucky, Virginia, Colorado, Minnesota, New Jersey, Georgia, and Kansas.   A citation to the decision of these different states construing these statutes will be found in 20 Am. & Eng. Enc. Law, 578, notes 1, 2, and Id, 579, note 1.   See, also, Jones, Chat. Mortg. § 245.

The determination, then, of the question now being considered depends entirely upon the construction of section 4743 of Mansfield's Digest, above set out—the statute in force here.   The statute is peculiar.   It will be observed that there are no express words in it making an unrecorded mortgage void as to any one, but it affirmatively declares

that each mortgage, whether for real or personal property, shall be a lien on the mortgaged property from the time the same was filed in the recorder's office for record, and not before, which filing shall be notice to all persons of the existence of such mortgage. Although unrecorded chattel mortgages are not, in words, declared to be void as against anybody, yet, of course, the necessary inference is that they are. The very object of the statute is to make them so; or, in other words, to make valid that which was otherwise void, to wit, an unrecorded mortgage on property with possession retained by the mortgagor. And as the recorded mortgage was to be notice, and therefore to become valid, as to all persons, it necessarily follows that an unrecorded mortgage was not to be notice, and therefore not valid, as to any person, whether he be a subsequent purchaser or a creditor whose debt was created either before or after the execution of the mortgage. An examination of other sections of the Arkansas statute will aid us in the proper construction of this statute. It will be seen that this section (4743) puts mortgages on real and personal property on the same footing. Section 671 of Mansfield's Digest provides: "No deed, bond or instrument of writing for the conveyance of any real estate, or by which the title thereto may be affected in law or equity, hereafter made or executed, shall be good or valid against a subsequent purchaser of such real estate for a valuable consideration without actual notice thereof; or against any creditor of the person executing such deed, bond or instrument, obtaining a judgment or decree, which by law may be a lien upon such real estate, unless such deed, bond or instrument, duly executed and acknowledged, or approved, as is or may be required by law; shall be filed for record in the office of the clerk and ex officio recorder of the county where such real estate may be situated." This section makes all unrecorded deeds, bonds, or instruments of writing for the conveyance of real estate, or by which the title

*No notice imparted by an unrecorded mortgage.*

to real estate may be affected in law or equity, void as to all subsequent purchasers for a valuable consideration and without actual notice, and also void as against any creditor of the grantee who may secure a judgment or decree which, by law, may be a lien on such real estate. But the following section (672) provides that nothing contained in the preceding section shall affect section 4743, and, as real-estate mortgages are included in section 4743, it has the effect of excluding a real-estate mortgage from the operation of the above section (671), and placing them on the same footing with chattel mortgages. What was the purpose of this exclusion? Did the legislature intend that one holding a mortgage to land—a mere security—should be put in a better condition than one holding an absolute deed to it, when both are unrecorded, and that an unrecorded chattel mortgage should stand higher than an unrecorded deed to land? We think not. The evident purpose was that the mortgage should be placed in a lower scale than a deed. Comparing the two statutes, the one makes the instruments included in it, if unrecorded, void as to subsequent purchasers for value and without actual notice, and also void as to all creditors who may have obtained judgment liens on the land; the other, as to the instruments included in it, makes no mention of subsequent purchasers for value without actual notice, or creditors who may have procured judgment liens. It simply provides that when the instrument shall have been recorded it shall constitute a lien on the property from that time, and "not before," and that it shall be notice to all persons; and as the first, by its express terms, included both creditors and purchasers, so the term "all persons" in the second was intended to include both. But even an unrecorded deed to land is void as to a creditor with his judgment lien; and in this case there was an attachment lien fixed upon the property before the mortgage was recorded, as well as a judgment rendered. But the construction given

to section 4743 by the supreme court of Arkansas before the statute was extended over this jurisdiction is conclusive of this matter, and is binding on us; and, as heretofore shown, that construction has uniformly been, that an unrecorded chattel mortgage is void as to creditors and subsequent purchasers, even with actual notice of the existence of the mortgage. In the case of Main vs Alexander, supra, construing this very section, the court held that the levying of an attachment before foreclosure and sale ipso facto utterly ousted the mortgagee of all the rights that he had acquired under the unrecorded mortgage as to strangers to the instrument; and this construction of the statute has been reaffirmed and adhered to by that court to the present time by many decisions rendered by it. In the case of Cross vs Fombey, supra, the court, in construing this statute, speaking of unrecorded mortgages, say: "Though good between the parties, until filed for record under this statute, the lien of a mortgage as to third parties has no existence, and is not binding upon them, though they have actual notice of it." And in this same case the court held that testimony offered at the trial that the mortgagee had taken possession of the property under his unrecorded mortgage shortly after the writ came into the hands of the officer, and before levy, was properly excluded. In the case of Martin vs O'Bannon, 35 Ark. 62, a mortgage had been executed on the real estate in controversy, but so defectively acknowledged and recorded that the court pronounced it void. After the execution of the mortgage, the mortgagee continued to sell the property to the defendant, and a part of the purchase price was paid, and for the balance notes were executed which constituted liens upon the land. Title was retained in the grantor. These notes were afterwards indorsed by the grantee, and delivered to the plaintiff. Prayer for decree against defendant for the amount of the notes and interest, and that the same be declared a lien on the premises, etc. The answer sets

up and relies on the mortgage, and alleges that the defend-
ant at the time of his purchase had actual notice of its ex-
istence.    The answer also denied that plaintiff came into
possession of the notes for a valuable consideration, or any
consideration whatever.    Upon these facts the court say:
"The lien of Hare [the  grantor and  mortgagee]  upon  the
land to secure the purchase-money notes executed to him by
Martin [the defendant] was in the nature of a mortgage, and
when he transferred the notes to the appellee [the  plaintiff]
the lien passed with them, and appellee had  the  right,  by
subrogation, to foreclose the lien.    The bill alleges  that ap-
pellee took the notes for a valuable consideration, which the
answer denies; and the demurrer to the answer  admits  this
to be true."    The court then holds that the defendant, "hav-
ing no lien upon the lots except as against Hare [the  grant-
or], his heirs and administrators [Hare being  dead],  under
their unrecorded mortgage were in no  attitude  to  impeach
the consideration of the transfer of the notes by Hare to ap-
pellee [plaintiff].    As to appellee, the mortgage was as if
never made."    These authorities so clearly and  certainly
construe the statute in force here as including all  creditors,
both prior and subsequent to the execution of the  unrecord-
ed mortgage, that we deem it  unnecessary  to  burden  this,
already too lengthy, opinion with further extracts from  the
decisions of the supreme court of Arkansas.    Many of them
have been referred to, and all cited,  in  that  part  of  this
opinion relating to the second proposition discussed  by  us.
Let the judgment of the court below  be  reversed,  and  the
cause remanded.

TOWNSEND, J., concurs.